IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DERREK SIMS, | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:20-cv-01243-(CJN) |
| | ) |
| v. | ) |
| | ) |
| WASHINGTON METROPOLITAN | ) |
| AREA TRANSIT AUTHORITY, | ) |
| | ) |
| Defendant. | ) |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OPPOSITION AND REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

Plaintiff, Derrick Sims, (hereinafter referred to as "Plaintiff") was employed by Washington Metropolitan Area Transit Authority (hereinafter referred to as "WMATA" or "Defendant"). WMATA has an Employee Rulebook, as well as an Electronic Device Policy which are both of equal seriousness and equally enforced by WMATA. WMATA's Employee Rulebook and Cardinal Rules 'Truthful Statements' Section 1.2.1, states: "Employees must make timely, complete, and truth statements at all times. 1.2.2 Any employee providing false or misleading information or documentation will be subject to immediate dismissal. (Exhibit A: Rulebook, Section 1.2) Further, the Accident/Incident Report Section 1.33 states in pertinent part: "Failure to immediately report an accident or incident or any attempt to conceal or misrepresent facts is an extremely serious violation of rules and will result in dismissal." (Exhibit A: Rulebook, Section 1.33).

1

WMATA's Electronic Device Policy, Enforcement Provision Section 6.0 provides that the first offense for "*using*" a phone is discharge; and the first offense for "having a phone *on their person*" is 10-day suspension. Plaintiff is aware of the Electronic Device Policy but has no knowledge, nor received any notice of any specific definitions or broad interpretations of the terms in the Policy. (Dkt. 15-2 P/I: 10.3/4). WMATA has not provided such notice to employees. (Greenfield Dep. 66:9-20).

On or about September 3, 2019, Plaintiff was operating a WMATA vehicle. While operating the vehicle, Plaintiff was observed by a supervisor who was driving down the highway attempting to look inside Plaintiff's vehicle. While operating the vehicle, Plaintiff had his iPhone inside his right pocket. As he hit a bump in the road, the iPhone began to fall out of his pocket. Plaintiff reached with his right hand and picked up the phone to reposition it and prevent it from falling. The Raise to Wake feature on the iPhone automatically illuminated the iPhone while Plaintiff was holding it in his right hand for 2-3 seconds. Plaintiff placed the iPhone in a secure place and continued driving until his supervisor asked that he stop. This was verified by video surveillance. (Dkt. 15-12 Video). At no time was Plaintiff using his iPhone. This was Plaintiff's first offense of violating the Electronic Device Policy by having a phone on his person. On September 17, 2019, Plaintiff was terminated on the basis of "using" his iPhone.

Approximately one month later, Brett Miller, who is a Caucasian male employee of WMATA, was driving a metrobus. Brett Miller caused a crash in the vehicle, did not immediately report the crash, and when he did later report the crash, he made false statements in the report. This was verified by video surveillance. Brett Miller directly and inexplicitly violated the WMATA Handbook and Cardinal Rules which are also outlined in the Notice to Operators, which states in red bold font, "Failure to immediately report an accident or incident or any attempt to conceal or

misrepresent facts is an extremely serious violation of rules and will result in dismissal." Brett Miller was not terminated, and instead was disciplined less harshly and received only two 10-day paid leave suspensions.

Both the Plaintiff and Brett Miller violated serious WMATA rules. WMATA unlawfully discriminated against Plaintiff by disciplining him much more harshly than his white co-worker, without any clear or specific reason. The only differences between Plaintiff and Brett Miller are that Plaintiff is an African American male who was terminated for his first offense rather than suspended; and Brett Miller committed three, much more serious offenses, and is a white male who was suspended rather than terminated.

**ARGUMENT**

A. **WMATA Failed to Meet Its Burden of Providing Admissible Evidence Showing a Legitimate, Nondiscriminatory, Clear, and Reasonably Specific Explanation for Its Actions.**

Once the Plaintiff has established a prima facie case of Title VII discrimination, the Defendant has burden to articulate nondiscriminatory reason for its action. Civil Rights Act of 1964, § 701 et seq., as amended and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, (1973). WMATA has failed to do this because they have only provided the Electronic Device Policy (Dkt. 15-2: Policy) to explain their actions, which is not enough. (See *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019)).

In *Figueroa v. Pompeo*, the D.C. Circuit addressed what the employer must show, noting that "[a]n employer cannot satisfy its burden of production with insufficiently substantiated assertions." *Id.* There, the court outlined the four paramount factors in determining if a Defendant has met their burden under the McDonnell Framework: (1) the employer must produce admissible evidence that a factfinder may consider at trial; (2) if the factfinder must be able to reasonably be

able to find that the employers actions were motivated by a nondiscriminatory reason; (3) the nondiscriminatory explanation must be legitimate and facially "credible"; and (4) the evidence must present a "clear and reasonably specific explanation. *ID.* In *Figueroa v. Pompeo*, the Court found that the Defendant failed to meet the fourth element for failing to present a "clear and reasonably specific explanation" for the termination because his articulation of a purported legitimate, nondiscriminatory reason "conceal[ed] the target" when Defendant only produced an eight-page chart outlining the Department's core precepts, declarations from board members stating that they followed the precepts and a copy of the employee's evaluations. *Id.*

Here, WMATA has similarly produced a nine-page policy and testimony indicating the ambiguous interpretation of such policy by some of the Labor Relations Consultants, such as Joshua L. Greenfield. Mr. Greenfield testified that the Policy has been interpreted in broad terms, and further, that he is unaware that those interpretations are made aware to the employees who are subject to them. Also, the Defendants have not provided any proof that such broad interpretations of the Policy terms have ever been communicated to the Plaintiff. Mr. Greenfield testified that:

> A. From our past practice and how we've interpreted it.
> Q. Okay. Because you were not involved in the creation of this policy, correct?
> A. No, I was not.

Greenfield Dep. 40:5-9

> A. – those words are used, but I can tell you that historically that is how it has been administered and interpreted.
> Q. Okay. Has that been communicated in writing to operators and maintenance workers alike, that the policy is being interpreted that broadly?
> A. I couldn't say what is – what actual written communication goes to operators and maintenance and construction personnel…

Greenfield Dep. 66:9-20.

By simply providing proof that there is a Policy and that the decision to terminate the Plaintiff was based on such Policy, is not showing a legitimate, nondiscriminatory, clear, and

4

reasonably specific explanation for its actions. See <u>Figueroa v. Pompeo</u>, where the D.C. Circuit found that simply having a eight-page chart outlining the Department's core precepts, declarations from board members stating that they followed the precepts, was not enough, without clear and reasonably specific explanation as to how the employer applied their standards to an employee's specific circumstances and "[f]ailing to provide such detail—that is, offering a vague reason—is the equivalent of offering no reason at all." *Id.* at 1092. Like *Figueroa*, the simple fact that there is a nine-page Policy with WMATA does not prove, specifically, that the decision to terminate the Plaintiff was not based on unlawful discrimination.

  Here, WMATA continuously declares that the Plaintiff "was terminated for a legitimate, non-discriminatory reason – namely his violation of WMATA's Zero Tolerance Electronic Device Policy" (quoting Defendant's Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment). However, simply stating that, alone, is not sufficient enough to be considered a "clear and reasonably specific explanation." *Id.* WMATA has failed to clearly and *specifically explain* why they terminated Plaintiff rather than give him the appropriate 10-day suspension, as outlined by the Policy.

  WMATA's Policy Enforcement Provision Section 6.01(a)(b): Revenue Vehicles states: "(a) *Using* an Electronic Device while Operating a Revenue Vehicle, First Offense: Discharge; and (b) Any other violation in Revenue Vehicles (i.e., an operator having a phone *on their person* while operating) (1) First Offence: 10-day suspension (2) Second Offense: Discharge." (Dkt. 15-2 P/I:6.01).

  Despite having reviewed Plaintiff's statements (Exhibit B:) and Laughery's statement (Dkt. 14-4: Laughery Email, Subject: Bus 7396 Mechanic Derrick Sims) and the surveillance video (Dkt. 15-12 Video of Incident) which verifies the statements, WMATA continues refer to the

5

Policy and strategically ignore the Enforcement Provision, Section 6.01(b)(1) which calls for a driver who has a phone "on their person" to be subjected to a 10-day suspension for their First Offense. (Dkt. 15-2 P/I:6.01). This was Plaintiff's first offense. WMATA has not provided any reasons for choosing the more serious disciplinary action over the less serious disciplinary action regarding Plaintiff's alleged violation of the Policy.

Failing to articulate such a reason properly "is the legal equivalent of . . . having produced no reason at all." *Patrick v. Ridge*, 394 F.3d 311, 320 (5th Cir. 2004). WMATA has not provided any "Clear, and Reasonably Specific Explanation" as to why they believe Plaintiff repositioning his phone as it was falling from his pocket is not considered "an operator having a phone on their person while operating" verses "using" the cell phone. Lacking any clear and reasonably specific explanation, other than vaguely referencing the ambiguous "interpretation" of the Policy in the past, unknown to employees, does not fulfill WMATA's obligation set forth by the D.C. Circuit's fourth paramount factor.

Under the *McDonnell Douglas* framework, an employee who proves their *prima facie* case is entitled to a presumption that the employer discriminatorily mistreated them. The presumption dissipates only if the employer meets its burden of production. Without WMATA meeting their burden of articulating nondiscriminatory reasons for its action, the Plaintiff need not explain that such actions were pretextually discriminatory because he is already entitled to the presumption. Civil Rights Act of 1964, § 701 et seq., as amended; *McDonnell,* 411 U.S. 792, (1973).

**B. Plaintiff, Derrek Sims, has Provided Evidence Supporting that WMATA's Alleged Reason for Termination is Pretext and was Unlawfully Discriminatory in Violation of Title VII.**

If WMATA meets its burden in a Title VII action to articulate nondiscriminatory reason for its action, then the Plaintiff must prove that employer's proffered explanation is pretext. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq. Should the Court find

6

that WMATA has met their burden of providing admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions, the Plaintiff can still prove through direct evidence or indirect evidence, showing that the legitimate, non-discriminatory reason offered by WMATA is pretext and based on the prohibited discrimination. *McDonnell*, 411 U.S. 792, 802-05 (1973); *Holbrook v. Reno*, 196 F.3d 255, 260 (D.C. Cir. 1999).

The standard for Summary Judgment set forth in Rule 56(c) provides that the summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact…" ."*Celotex Corp.,* 477 U.S. at 324,106 S.Ct. 2548. (1986). "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'" *Hairston v. Vance-Cooks*, 773 F.3d at 271 (2014) (quoting *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012)).

The Plaintiff has produced enough evidence for any reasonable jury to find, by preponderance of the evidence, there is a genuine issue of material fact, and the WMATA's true reason for termination was discriminatory and based on the Plaintiff's race. First, the Plaintiff was not using his phone and simply had his phone "on his person" and should have been subjected to the lesser discipline mandated by the Policy. Second, the Plaintiff has shown pretext when he provided comparative evidence proving a white co-worker whose violations of WMATA's Policies were of similar seriousness, was only disciplined to a 20-day suspension, rather than the mandatory termination provided by the relevant Policy.

1. <u>The Plaintiff was not "using" his iPhone, as he only had it "on his person" when it was in his pocket, falling out, and he picked it up with his right hand to secure it as he drove.</u>

First, the nine-page Electronic Device continuously referenced to by the WMATA as the reason for terminating Plaintiff's employment, lists in detail, ten (10) definitions, including a

7

definition for "using an electronic device." The Definition, in pertinent part, for "using" an electronic device, such as a cell phone, is "(a) <u>using</u> <u>the</u> <u>electronic</u> <u>device's</u> <u>*functions*</u>, such as, but not limited to, viewing, charging, using the electronic device to check the time, or to check to see if any messages have been received. (b) <u>using</u> <u>the</u> <u>electronic</u> <u>device</u> <u>to</u> <u>communicate</u> orally or through text with another person or another device, such as, but not limited to, placing or answering calls and sending, reading or replying to text messages or emails." (Emphasis added). (Dkt. 15-2 P/I: 3.00)

According to this definition set forth in the Policy, the Plaintiff was not "using" his cell phone, as he never (a) "used its 'functions'" and never (b) used it to communicate. The Plaintiff presented supporting evidence that he never used the device's functions or communicated with it, when he provided his iPhone's mobile Data, Text and Talk log for the relevant time period. Exhibit C: The log shows there was no activity during the relevant time period on September 3, 2019.

iPhones possess a unique feature called "Raise to Wake." This allows for the phone to illuminate with any upward movement, such as holding it. The Raise to Wake feature will turn on your iPhone's screen automatically when it detects that the phone is being lifted, even without using the phone. "If you don't do anything, your iPhone will go back to sleep." (See support.apple.com)

The Plaintiff has stated multiple times, which is supported by an abundance of evidence, including a surveillance video, that he was not using his iPhone, and that it slipped from his pocket and when he reached to get it to reposition it, the light automatically came on. The "Raise to Wake" feature on the iPhone automatically illuminated the light. Evidence that supports this series of events includes an email from Samuel Laughery, dated September 3, 2019, which states in pertinent part, "Cell phone with the light illuminated in the right hand" (Dkt. 14-4: Laughery

Email, Subject: Bus 7396 Mechanic Derrick Sims). There is nothing in this email that indicates Mr. Laughery has any proof or knowledge that the Plaintiff was "using" his iPhone. In fact, this email provides support that the Plaintiff's phone was simply illuminated due to the Raise the Wake feature.

Additional provided evidence supporting the Plaintiff's claim that he was not "using" his iphone, is outlined in his affidavit dated September 3, 2019. (Dkt. 15-5: Derrick Sims Written Statement). In his affidavit, the Plaintiff again reemphasizes that, "…my cell phone was falling out *[sic]* my pocket when I hit a pothole, I grab my cell phone from falling out *[sic]* my pocket and the light on the cell phone came on." Affidavits or declarations that are "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and are cognizable evidence for purposes of supporting or opposing a motion for summary judgment. Fed. R.Civ.P. 56(c)(4); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 641 (9th Cir. 2012). Further, WMATA had an opportunity to examine Plaintiff about the subject matter of the affidavit, during Plaintiff's deposition. During such deposition, Plaintiff again explained that he was not "using" his cell phone:

> Q  All right. Are you disputing that you were operating a revenue vehicle? By –
> A  I (indiscernible).
> Q  —using a cell phone?
> A  I was drivin' a – I was operatin' a Metro vehicle, but I wasn't usin' a cell phone.
> Q  Okay. So you're – you're denying that you used a cell phone?
> A  Correct.
> Q  All right. Now, was your understanding from the policy that you did not actually have to use a cell phone? …

(Sims Dep. 40: 3-14)

> A. I was never usin' the phone.
> Q. Okay. So again, so you're saying that
> You didn't violate this policy here…
> A Correct

(Sims Dep. 41:3-7)

Plaintiff's testimony further explains that he had no reason to believe that his standard and common interpretation for the word "use" would not be the same one used in the Policy.

> Q Okay. Now, you say you didn't use the phone. To you, what is using your iPhone?
> A Text messaging, receiving phone calls, on the internet.
> Q Right. Would you consider checking your Phone for the time use of your phone?
> A Personally, me? No.
> Q Well, okay. Let's – what about Actually taking a phone out of your pocket while you're driving and the light's showing? Do you think that's use of a cell phone?
> A No.

(Sims Dep. 42:8-19)

WMATA has a specific distinction between the violations of *using* a phone and having a phone *on one's person*, so much so, that there are different disciplinary actions outlined in the Policy, Enforcement provision, section 6.00, as outlined above.

There is a genuine dispute in the material facts of whether Plaintiff holding the phone in his right hand while not using any of its 'functions' is considered "using" tfhe phone or if that would be considered having the phone "on his person".

Plaintiff's Affidavit is also supported by the facts outlined in WMATA's Grievance Report form signed September 17, 2019 (Exhibit D Grievance Report) as well as the termination letter dated September 6, 2019 (Dkt. 15-6 Termination Letter). In the Grievance Report, the "Facts of the Case" section explains, in pertinent part, that "…my phone was in my pocket about to fall out

10

when I retrieved my phone the light came on…" In the termination letter written by WMATA's BMNT Superintendent, Jon McDonald, that states, in pertinent part, that "a cell phone illuminated in your right hand."

The video surveillance that was recovered from the incident, and referred to in the termination letter, verifies the Plaintiff's factual assertions and affidavit, and show that his iPhone indeed was falling from his right pocket, and as he retrieved it with his right hand, the automatic Raise to Wake feature illuminated the light. The video also verifies that Plaintiff was never once "using" the device's "functions" or "communicating" with the iPhone. His mouth was not moving, his fingers were not pushing the phone, and it was not lifted to his ears. He was only holding it, "on his person."

As discussed above, there is no evidence available and the witness, Mr. Greenfield indicated he is unaware of, any notice given to explain the WMATA's broad interpretations of the Policy terms. Under the Policy section 3.0 Definitions, there is no existing definition for the phrase "on their person". The standard common definition of "on someone's person" is to be in one's possession.

"A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Arrington v. U.S.,* 473 F.3d 329 at 333 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

Here, a reasonable jury could easily find based on the evidence presented, that the Plaintiff was not using his phone, and that he merely had it in his possession and that he should have been disciplined with a 10-day suspension, not terminated, according to the appropriate

provision set forth in the Policy. Whether the Plaintiff's phone was "on his person" or being "used" is a fact that will affect the outcome of the case and should be determined by the jury.

2. <u>Plaintiff Has Shown Pretext by Providing Comparative Evidence Showing a Similarly Situated White Co-Worker Was Disciplined Less Harshly After Violating a WMATA Policy.</u>

A plaintiff must show that the proffered reason for termination is false, and that it is a pretext for the discriminatory motive proposed by the plaintiff. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 777 (8th Cir. 1995). Although WMATA has not offered a sufficient justification, the Plaintiff can prove the true motive of the WMATA is pretextual. *See Plummer v. Bolger,* 559 F.Supp. 324, 329 (D.D.C. 1983).

There are three ways to show that WMATA's justification was pretextual and that their actions were discriminatory: (1) directly, by demonstrating that a "discriminatory reason more likely motivated the employer," *George v. Leavitt,* 407 F.3d 405, 413 (D.C. Cir. 2005); or (2) indirectly, by demonstrating that the employer falsified the "underlying facts" that allegedly justified the termination, *See Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 494 (D.C.Cir.2008); or (3) indirectly, by demonstrating that a similarly situated employee received more preferential treatment or less harsh punitive measures. *Id.*

In order to establish that the Plaintiff is similarly-situated to another individual, he must "demonstrate that all of the relevant aspects of her employment situation were 'nearly identical' to those of the" comparator. *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir.1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995)). This includes demonstrating that the comparator was "charged with offenses of 'comparable seriousness.'" *Id.*

The Plaintiff, who is African American, has produced comparative evidence to show pretext when he proved that a white co-worker, Brett Miller who was found in violation of several

rules and of a WMATA policy, and who caused a bus crash (an act that the very Electronic Device Policy is aimed to prevent) was issued only two 10-day paid-leave suspensions, a much less harsh punitive measure than what the Plaintiff received, which was termination. Their scope of employment is the same and their situations are comparable in seriousness.

Both Plaintiff and Brett Miller are similarly situated employees, hired as mechanics and all of the relevant aspects of their employment situation are nearly identical in regards to their qualifications, job descriptions, and the rules they must both adhere to. Both have the same superintendent and report to the same departments. The Superintendent, Jon McDonald, who signed Brett Miller's lenient Investigation Report, is the same person who signed the termination letter sent to Plaintiff a month before.

Plaintiff was terminated for violating the Electronic Device Policy, as outlined above, by having his cell phone on his person while operating the vehicle. The Electronic Device Policy Enforcement Provision Section 6.00 provides that under 6.01(b)(1): "Any other violation in Revenue Vehicles (i.e., an operator having a phone on their person while operating) (1) First Offence: 10-day suspension."

On or about October 31, 2019, Brett Miller was given two 10-day suspension/paid leave when he violated WMATA's Employee Rulebook and Cardinal Rules. Section 1.2 Truthful Statements reads, 1.2.1 "Employees must make timely, complete, and truth statements at all times. 1.2.2 Any employee providing false or misleading information or documentation will be subject to immediate dismissal." Further, section 1.33 Accident/Incident Report states in pertinent part, "Failure to immediately report an accident or incident or any attempt to conceal or misrepresent facts is an extremely serious violation of rules and will result in dismissal." Plaintiff also provided evidence of Brett Miller's Investigation Report outlining how he clearly violated these rules by

13

failing to report an accident and failure to provide truthful statements. (Dkt. 15-8: Miller Oct. 4, 2019 Investigation Report).

Brett Miller also had a clear and unambiguous Notice of the interpretation and seriousness of this policy in the NTO #19-02 "Strict Enforcement" Notice which states in red bold font: "Failure to immediately report an accident or incident or any attempt to conceal or misrepresent facts is an extremely serious violation of rules and will result in dismissal." (Exhibit E As stated above, the Plaintiff never received notice that WMATA uses broad interpretations not commonly known to the public when deciding if someone has violated the Electronic Device Policy.

Plaintiff provides a truthful statement as to why his phone was illuminated in his right hand for 2 seconds, and he is dismissed; yet Brett Miller makes an untruthful statement and falsifies a report and receives 10-days paid leave suspension. Brett Miller violated a policy that is so serious in nature, that WMATA has issued specific Notices in red bold font explaining the seriousness of this act. In fact, WMATA calls it "an extremely serious violation of rules." Brett Miller was not dismissed after he crashed a WMATA metrobus, ironically, the exact type of dangerous and serious act that the Electronic Device Policy is aimed to prevent. Brett Miller's violations were of much more serious nature than the Plaintiffs, and yet he was only placed on two 10-day paid-leave suspensions. (Dkt. 15-8: Miller Oct. 4, 2019, Investigation Report). The rules that Brett Miller violated require termination, according to the policy. The rule that Plaintiff violated calls for a 10-day suspension. Further, there is a Petition signed by (35) members of the bus garage 922 that states in pertinent part, "there's been a clear racial bias at our division that can no longer be tolerated also we would like Mr. Derrick Sims to be reinstated…" (Exhibit F)

### C. **WMATA is Not Immune because Acting in Accordance with the Electronic Device Policy was a Ministerial Act which Waives Sovereign Immunity.**

Sovereign Immunity is uniquely enjoyed by WMATA "with respect to certain claims." *Pierce v. Wash. Metro. Area Transit Auth.*, Civ. No. DKC 09-1917, 2010 WL 4485826, at *3 (D. Md. Nov. 9, 2010); *McFadden v. Wash. Metro. Area Transit Auth.*, Civil Case No. GLS 19-629, 7 (D. Md. May. 24, 2021). "However, its sovereign immunity is not absolute." *Id.* See Section 80 of the Compact, which states, in pertinent part:

> The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees, and agents committed in the conduct of any proprietary function, in accordance with the applicable signatory (including rules of conflict of laws) but shall not be liable for any torts occurring in the performance of a governmental function.

To determine what constitutes a "governmental act," there is a two-part analysis. First, the court determines if the conduct was a "quintessential governmental function," (such as involving law enforcement) and if not, then second, the court will determine if the act was a "discretionary act" or a "ministerial act." *Smith v. Wash. Metro. Area Transit Auth.,* 290 F.3d 201, 207 (4th Cir. 2002). Discretionary acts retain immunity, as they are agency's governmental functions; whereas ministerial acts waive immunity, as they are proprietary functions of the agency. *Id.*; and *McFadden v. Wash. Metro. Area Transit Auth.*, Civil Case No. GLS 19-629, 7 (D. Md. May. 24, 2021).

"To distinguish a discretionary act from a proprietary one, a court asks two questions. First, whether a 'statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow.' *Pierce*, *supra*, at *4 (emphasis added) (quoting *KiSKA Constr. Corp.*, 321 F.3d at 1159). **If the course of action is prescribed, then the challenged conduct is not discretionary and WMATA is not immune.**" *Id.*

15

Here, WMATA was acting in accordance with their Electronic Device Policy. This Policy, as they have continued to emphasize, specifically prescribes a course of action for an employee to follow. Therefore, because the action was prescribed, the conduct is not discretionary and WMATA is not immune.

## CONCLUSION

WMATA failed to meet its burden of providing admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions because all they have explained is that they terminated the Plaintiff based on the Electronic Device Policy.

The Supreme Court has consistently emphasized that "at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 248, 249, 106 S.Ct. 2505. The Plaintiff has provided evidence supporting that there is a genuine issue of material fact as to whether Plaintiff, while holding his illuminated iPhone, was "using" it or was simply having possession of it in his hand. The determination of this fact will most certainly affect the outcome of the case.

The Plaintiff has provided enough evidence for a reasonable jury to agree that he should have been disciplined in accordance with the appropriate provision in the Policy, and the white co-worker, Brett Miller, was given a much less harsh punitive measures for violating a policy in much more extreme and serious ways.

Further, WMATA has waived immunity by acting in accordance with the Policy.

Respectfully submitted this 7th day of March 2022.

                                             *Charles T. Tucker Jr*_____
                                             Charles Tucker, Jr., Esq.
                                             D.C. Bar No: 993515
                                             Tucker Moore Group, LLP
                                             8181 Professional Pl. Suite 207
                                             Hyattsville, MD 20785
                                             E-mail: charles@tuckerlawgroupllp.com
                                             Tel.: (301) 577-1175